CAPPS v. BLONDEAU, 2015 NCBC 38 (03-05-2015)

STATE OF NORTH CAROLINA

COUNTY OF WAKE

ESTATE OF MARTHA B. CAPPS, by and through its Executor, Bruce L. Capps, and THE ANNE KYLE TRUST, by and through its Successor Trustee, Branch Banking and Trust Company,

        Plaintiffs,

        v.

HAROLD EARL BLONDEAU; NEAL WILLIAM KNIGHT, JR.; ANNE LOUISE KNIGHT; HELEN SOUTHWICK KNIGHT; MORGAN KEEGAN & COMPANY, INC.; MARVIN L. BAKER FAMILY FOUNDATION, INC.; and REGIONS BANK, d/b/a REGIONS MORGAN KEEGAN TRUST,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
07 CVS 16486

VERDICT AND JUDGMENT
AS TO
DEFENDANT
HAROLD EARL BLONDEAU

THIS MATTER came before the undersigned Chief Special Superior Court Judge for the North Carolina Business Court on September 16, 2014, for a bench trial as against Defendant Harold Earl Blondeau ("Blondeau"), pursuant to the special non-jury setting and Notice of Bench Trial issued September 3, 2014.

Plaintiffs were represented by Robert E. Zaytoun, Esq., Gilbert W. File, Esq., Matthew D. Ballew, Esq. and John R. Taylor, Esq. Defendant Blondeau did not appear.

During jury selection of this matter on and after August 25, 2014, Plaintiffs and Defendants Morgan Keegan and Regions Bank resolved Plaintiffs' claims through a confidential settlement agreement. In the course of this resolution, Plaintiffs agreed to dismiss and have since dismissed their claims against Defendants Neal Knight, Anne Knight and Helen Knight without prejudice, and reserved all claims as against those

defendants. Plaintiffs' claims as against Defendant Blondeau proceeded to bench trial on September 16, 2014.

Based upon live testimony, deposition testimony, documentary evidence and pleadings offered by Plaintiffs at trial of this matter, the court makes the following FINDINGS OF FACT:

1.      As reflected in the Notice of Bench Trial issued September 3, 2014, this civil action was called for jury trial on August 25, 2014. Before jury selection began, Defendant Blondeau personally appeared and stated on the record that he was physically present only as a witness pursuant to subpoena, and that he did not intend to participate as a party at trial, including with respect to jury selection. He requested, and was granted, permission to leave the courtroom, and he did not return during the pendency of the trial. Subsequently, during the course of jury selection, all claims, except those by Plaintiffs against Defendant Blondeau, were resolved. Plaintiffs made an oral motion to withdraw their request for jury trial and to proceed in due course against Blondeau, and the court found that Blondeau waived his right to a jury trial by failing to participate voluntarily in the trial of this matter. This order and Notice of Bench Trial was properly served on Hal Blondeau, and the court now further finds that Defendant Blondeau received adequate notice of this bench trial, and the court has personal jurisdiction over him.

2.      Martha Capps ("Capps") was not financially sophisticated. Capps obtained a two-year degree from Peace College and briefly worked as a secretary in the Department of Agriculture before the birth of her first child, but she never worked again

outside the home after her children were born. She was a longtime victim of spousal abuse.

3.    This action was commenced on her behalf by Capps' son, Bruce Capps, on October 17, 2007, acting in the capacity of litigation guardian ad litem pursuant to Rule 17, North Carolina Rules of Civil Procedure ("Rule(s)"). Capps died on March 12, 2011, at the age of 84 years. Bruce Capps, as Executor of the Estate of Martha B. Capps, and the Anne Kyle Trust, by and through its Successor Trustee, BB&T, were substituted as Plaintiffs in this action pursuant to an order entered July 8, 2011.

4.    Defendant Blondeau served as the financial and investment advisor from at least as early as 1988 through at least February of 2006. During that time, Capps relied upon Blondeau to advise her regarding all of her financial concerns, including the investment of all funds and the management of her investments and other funds in a reasonable and proper manner.

5.    In 1988, Capps learned that she would become the primary beneficiary of her aunt Anne Kyle's ("Kyle") estate. Due to an alcoholic husband who created an abusive adulterous, isolated, and controlling environment for her, Capps was concerned about receiving a large inheritance.  She worried that her husband would receive a large marital share if he divorced her, and wondered how her financial independence and her children's interest might be affected. She expressed these concerns, along with a "very strong desire to have [her] share of the estate held in such manner as to protect it from the demands of [her] husband," to attorney John Beard ("Beard") in December 1988.

6.    Beard explained to Capps that Kyle, a Florida resident, could change her estate plan to address Capps' domestic situation and special concerns. Capps shared

this important, attorney-client privileged communication with Blondeau, whom she also had invited into the confidence of her meeting with Beard. Beard then referred Capps to a Florida attorney, Neal Knight ("Knight"), with whom he was acquainted through professional associations. Shortly thereafter, Blondeau wrote Knight a letter regarding Kyle's estate planning for the benefit of Capps, and asked Knight to communicate with him rather than Capps. Knight drafted the Anne Kyle Trust ("AKT"), and Kyle died in 1989, shortly after formally establishing the AKT.

7. Accordingly, in 1989, Capps became the sole beneficiary of the AKT, which required the trustee to pay to Capps the net trust income at least quarterly unless she otherwise directed in writing. Additionally, the trustee was permitted to make principal distributions to Capps as necessary for her health, education, maintenance and support. Neither trust allows the trustee to invade the trust principal for charitable contributions, gifts, or the like.

8. At Blondeau's advice and direction, and because he was employed there, A.G. Edwards was appointed as corporate trustee of the AKT and handled the administration of the trust assets from approximately 1989 to 1997.

9. Upon Kyle's death in 1989, Capps retained Knight to serve as her resident process agent and estate administration attorney since she was appointed by her aunt to administer Kyle's estate in Florida.

10. In June 1991, Blondeau and Knight offered to help move Capps from her home. Ultimately, Knight and Blondeau were involved in Capps moving into an assisted living facility in late December 2005, although most of the details of this move were handled by Bruce Capps and his wife, Debbie Capps.

11.    In March of 1997, Blondeau left his employment at A.G. Edwards and thereafter became a financial advisor at Morgan Keegan. Upon changing firms, Blondeau suggested to Capps that she move her brokerage account and the AKT to Morgan Keegan and its affiliated trust company.

12.    Since the AKT was established in Florida and administered under Florida law, Capps retained Knight to petition the Palm Beach County Probate Court to approve the change of A.G. Edwards to Morgan Keegan's affiliated trust company as Trustee of the AKT.  Knight drafted and filed this Petition and thereafter obtained the permission of the Florida Probate Court to appoint Morgan Keegan's affiliated trust company, which later became Regions Bank, as the Successor Trustee of the AKT.

13.    Blondeau continued to provide financial and investment services to Capps as an employee of Morgan Keegan.

14.    In August 2000, Capps met with a prominent Raleigh estate planning and tax attorney, W. Gerald Thornton ("Thornton"), having been referred to him by Blondeau. Capps and Blondeau initially met with Thornton to discuss updating her existing estate planning documents, which had previously been drafted by attorney Beard.

15.    Blondeau attended this initial client conference with Capps, and Thornton suggested to Capps, in Blondeau's presence, that they should excuse Blondeau from the conference so that Thornton and Capps could confer alone. Capps insisted on having Blondeau present for this conference, referring to him as her "trusted advisor." Thornton also came to understand that Capps had an abusive marital situation and did

not wish to receive phone calls or communications to her home. Rather, she requested that communications be directed to Blondeau.

16. During this first meeting with Capps, Capps stated that she wanted to make certain changes in her Will, including addition of specific bequests, exercising a testamentary power of appointment conferred to her in the AKT, as well as executing a health care power of attorney and a durable, financial power of attorney.

17. Since Thornton was only updating Capps' existing estate planning documents, and not undertaking any further review, he did not need or request to receive financial and tax information from Capps or the AKT.

18. During the course of his representation of Capps, Thornton spoke to Knight in one phone call, which was very general in nature.

19. On or about October 4, 2000, Blondeau fraudulently or through false pretenses obtained Capps' signature on a written request to the corporate trustee of the AKT for disbursement of $250,000 for a purported domestic court settlement involving her daughter and also for Capps' travel and an unspecified building project. On October 13, 2000, the corporate trustee disbursed $250,000 from trust principal of the AKT and wired the funds to Capps' brokerage account. In truth, $200,000 of this trust disbursement was deposited into Blondeau's Wachovia account. This transaction was improper, wrongful and fraudulent.

20. Thornton first became aware that there existed undistributed income in the AKT in late 2000 when Blondeau told him that for some ten years the prior trustee had not made required income distributions from the AKT to Capps. This was an issue

raised by Blondeau and did not impact any legal issues within Thornton's scope of work for Capps.

21. On or about January 3, 2001, Blondeau sent Thornton a letter which stated that the accumulated undistributed income in the AKT was $937,547. Thornton performed limited research regarding possible options for Capps to address this accumulated income issue, but was never retained to address it.

22. In July 2001, Thornton met with Blondeau and Capps to discuss the finalization of Capps' estate planning update. During the course of this meeting, Thornton provided general information and possible alternatives, as preliminary talking points, for Capps to begin considering regarding addressing the accumulated income in the AKT. Thornton made no recommendations, gave no legal advice and ran no specific calculations. Among the possible alternatives Thornton mentioned to Capps a charitable lead annuity trust, a grantor-retained annuity trust, a charitable remainder trust and a private charitable foundation.

23. Capps stated that she would think about these and get back to Thornton. He expected that she would consider the general information and request further assistance from him. He never received any request to do so.

24. On August 21, 2001, Capps executed, at Thornton's law office, the estate planning documents drafted by Thornton, including a Last Will and Testament, Health Care Power of Attorney, Durable, financial Power of Attorney, and a Living Family Trust. Blondeau was personally present for Capps' execution of these legal documents and made no mention of a private charitable foundation having already been established a month earlier in July, 2001.

25.    The primary beneficiaries of Capps' Last Will and Testament were her children, Bruce Capps and Carol Woodry. Thornton was named as Executor, and Blondeau and Morgan Keegan Trust Company were appointed to serve jointly as successor executor.

26.    The Health Care Power of Attorney drafted by Thornton and executed by Capps appointed her son Bruce Capps as Health Care Agent. Capps' financial Power of Attorney appointed Blondeau as her attorney-in-fact, with Knight appointed as successor.

27.    On June 19, 2001, approximately a month prior to Thornton's July meeting with Capps and Blondeau, Knight sent to Blondeau a sample set of Bylaws and Articles of Incorporation for a private charitable foundation. Prior to his meeting with Capps and Blondeau in July, Thornton did not mention a private charitable foundation as a possible alternative to either Capps or Blondeau.

28.    On or about July 23, 2001, and without Thornton's knowledge, Blondeau sent a fax letter to the Regions Bank administrator of the AKT which stated that Blondeau had calculated a rate of return on the accumulated undistributed income, and that total undistributed accumulated income, after including figure for lost return, came to $2,141,559. Significantly, the last paragraph of this letter stated, "Mrs. Capps' attorney has not seen these totals and has not given me a number that he would advise her is fair. I believe I can control this situation if he pushes for higher rates." Thornton never saw this letter and was never provided the information regarding the rate of return calculated on trust income owed to Capps that had not been paid for the preceding decade. Blondeau intentionally concealed this information from Thornton.

29.     On July 25, 2001, Knight filed Articles of Incorporation for the Marvin L. Baker Family Foundation ("Baker Foundation") with the Florida Secretary of State, which he had drafted. This information was similarly concealed from Thornton by Blondeau.

30.     The Articles of Incorporation provided that the only directors of the Baker Foundation, which was named after Capps' father, were Blondeau, Knight, and their children, R.J. Blondeau and Anne Knight. Neither Capps nor her children, Bruce Capps and Carol Woodry, were named a director. The sole officers of the Baker Foundation were Knight and Blondeau.

31.     The Bylaws for the Baker Foundation were also drafted by Knight, without any involvement with Capps. Knight communicated only with Blondeau regarding the Bylaws and Articles of Incorporation. The Bylaws provide that no person could serve on the Board of Director without the express consent of Blondeau. The Bylaws were signed by Blondeau on August 8, 2001, only two weeks prior to Capps' execution of the estate planning documents drafted by her estate planning attorney, Thornton. Thornton was not provided any of this information.

32.     The first minutes of the Baker Foundation were dated July 27, 2001. Anne Knight was elected Assistant Secretary, and R.J. Blondeau was elected Assistant Treasurer. These minutes provided that checks from the Baker Foundation must be signed by at least two officers, neither of whom was Capps. All minutes were drafted by Knight after the meetings took place.

33.     Knight claimed that he never represented Capps for the purpose of establishing the Baker Foundation. He further claimed that he never recommended a $2

Million private charitable foundation to Capps, and never gave her any tax or legal advice. Knight obtained his undergraduate degree from Duke University, his law degree from Harvard University. At times material to this matter Knight focused his practice on estate planning, estate and trust administration and tax law with a law firm in Palm Beach, Florida with which he was employed since 1971.

34. Thornton testified, and the court finds as fact, that the recommendation of a private charitable foundation requires a complex calculation and analysis of a client's tax and financial condition, and that the client must be advised regarding the material provisions of the governing documents.

35. On August 21, 2001, Regions Bank, as corporate trustee of the AKT, transferred $2.1 Million of cash and securities to Capps' brokerage account. This happened on the same day that Capps executed her estate planning documents at Thornton's law office, with Blondeau present. Thornton was never informed about this transaction or the existence of the Baker Foundation. These facts were purposely concealed from Thornton by Blondeau.

36. Of the $2.1 Million transferred into Capps' brokerage account, over $1.9 Million was held in securities which were transferred in-kind from the AKT. These securities were immediately sold at a capital loss of $452,452. This capital loss did not provide tax benefit to Mrs. Capps.

37. Subsequently, on or about August 28, 2001, seven days after the execution of Capps' estate planning documents, $1,775,000 was irrevocably transferred by wire from Capps' brokerage account to a Florida account for the Baker Foundation, along with $156,996 of securities transferred in-kind, for a total of $1,931,996. On

September 6, 2001, an additional $10,000 was wired to the Baker Foundation from Capps' brokerage account.

38.    A charitable contribution to the Baker Foundation in the amount of $1,775,000 was reported on Capps' 2001 tax return.  However, all but $5,387 of Capps' charitable contribution tax deduction lapsed unused in 2006. Capps therefore received virtually no tax benefit from a charitable contribution in 2001 that constituted over 81% of everything she owned to a charitable foundation as to which she did not have either control or a vote.

39.    Neither Capps' certified public accountant, Ken Martin, nor her attorney, Thornton, would have recommended such a result had they been asked to professionally advise Capps on a private charitable foundation.

40.    Blondeau and Knight appointed themselves as President, Vice President, Secretary, Treasurer, and Directors of the Baker Foundation. They also named as Directors their children, R.J. Blondeau and Anne Knight. As directors of the Baker Foundation, these four individuals had the exclusive legal right to choose which persons and entities would receive money from the Baker Foundation in the form of charitable gifts, expenses, reimbursements, fees and salaries. Neither Capps nor her children or other intended beneficiaries had any legal right to direct any contributions to specific charities of their own choosing or to approve other disbursements from Capps' former property.

41.    Blondeau was required by the financial industry and by his brokerage, Morgan Keegan, to disclose any outside business activities, including any outside compensation. Blondeau did not inform Morgan Keegan that he was an officer and

director of the Baker Foundation until April 11, 2006. At that time, he falsely stated that he was "Director and [President] for 2006" even though he had been director, president, and treasurer at all times since 2001. He further falsely stated that no Morgan Keegan client was involved in the Baker Foundation and that he would receive no direct or indirect compensation.

42. Blondeau was not permitted by his brokerage employer to be appointed or to serve as a Morgan Keegan customer's attorney-in-fact or executor. Blondeau disclosed his involvement with the Baker Foundation to Morgan Keegan only after his undisclosed role as Capps' attorney-in-fact was revoked by Capps and served on him March 21, 2006. Prior to that date, Blondeau actively concealed these facts from his employer.

43. On September 10, 2001, Knight's daughter, Helen Knight, received the first of five disbursements totaling $62,837.50 from Capps' brokerage account, which were paid to American University for her undergraduate education. These payments were orchestrated by Knight and Blondeau, and they were fraudulent as to Capps.

44. On September 21, 2001, less than a month after the funding of the Baker Foundation, the sum of $75,000 was wired from Capps' brokerage account to Knight's bank account in Florida. This payment was orchestrated by Knight and Blondeau, and was fraudulent as to Capps.

45. Beginning August 29, 2002, Knight's daughter, Anne Knight, received the benefit of the first of six disbursements totaling $24,000 to Brooklyn Law School where she was enrolled as a law student. In five out of six of these transactions, each time Brooklyn Law School received a $4,000.00 disbursement from Capps' brokerage

account, Anne Knight received a refund of $4,000. In the last of these six transactions, Anne Knight received a refund of $2,868.50. Therefore, only $2,868.50 of the $24,000 paid to Brooklyn Law School from Capps' brokerage account was actually used for tuition. These payments were orchestrated by Knight and Blondeau, and they were fraudulent as to Capps.

46. None of the purported gifts to the Knights in the form of cash or alleged tuition payments was reported to Capps' accounting firm, Stancil & Company. Blondeau was the exclusive point of contact for Capps' accountant after March 13, 2000. Blondeau actively concealed the financial transactions benefiting the Knights from Capps' accounting firm.

47. Blondeau was prohibited by the financial industry and also by his brokerage from receiving any gifts from a Morgan Keegan customer in excess of $100 annually. He also was prohibited from receiving any loans from a Morgan Keegan customer.

48. From 2003 through 2005, Blondeau made unauthorized charges on Capps' Morgan Keegan debit card in the amount of $21,761.36 for personal purchases of wine.

49. Through various devices Blondeau also fraudulently received cash from Capps' brokerage account and the AKT in the total amount of $487,277.58. This was effected through checks from the AKT or the Morgan Keegan Brokerage and routed to Wachovia Bank, which funds ultimately were received by Blondeau. The mechanics of these disbursements were designed to conceal the fact that Blondeau was the real recipient of the funds.

50. Blondeau further orchestrated the fraudulent purchase of a beach cottage ("Beach Cottage") in Morehead City, North Carolina, for the price of $350,000. The purchase price was wired from the AKT directly to the closing attorney, and also involved a cash refund to Blondeau at closing of at least $29,000. This fraudulent scheme involved the following:

(a) On May 14, 2004, Blondeau drafted and prepared a written request, and obtained Capps' signature to the request through the use of false pretenses or other fraudulent means, which document falsely and fraudulently stated that Mrs. Capps was purchasing the Beach Cottage. The document requested that Regions Bank, as Trustee, wire transfer the sum of Three Hundred Fifty Thousand ($350,000) to a real estate attorney chosen by Blondeau for closing of the sale.

(b) At the time, Capps had no personal or business need for a second residence. In fact, she had full use of a condominium in Carteret County, North Carolina, which was titled to the AKT and fully available for Capps' use and benefit.

(c) The May 14, 2004, written request was drafted and prepared by Blondeau, and falsely represented that Capps wanted to use the funds to purchase the Beach Cottage since she was allowing her son and his wife to use the beach condominium owned by the AKT. This materially false representation was known by Blondeau to be false at the time it was made. Additionally, the representation was intended to be relied upon by Capps' fiduciary, Regions Bank. In truth, this money was to be used fraudulently by Blondeau to buy the

Beach Cottage for his personal use.

(d)     On or about June 11, 2004, the purchase of the Beach Cottage closed.  A warranty deed was recorded for the Beach Cottage, which conveyed legal title to the Beach Cottage to Blondeau, Blondeau's wife and Capps as joint tenants with right of survivorship. This meant that Capps' interest in the Beach Cottage would automatically be vested in Blondeau and his wife upon Capps' death regardless of her Will or any trust for her benefit or that of her family.

(e)     Four months later, on October 19, 2004, Blondeau requested a closing attorney in Morehead City to draft and prepare a quitclaim deed for Capps to transfer all of her right, title, and interest in the Beach Cottage to Blondeau and his wife. Thereafter, through false pretenses or other fraudulent means, Blondeau obtained execution of the quitclaim deed by Capps. The document was recorded in the public records and falsely stated that Capps was unmarried, when in fact she was still married to Edwin Capps, a fact well known to Blondeau. The quitclaim deed further falsely stated Blondeau and wife paid Capps "valuable consideration" for the transfer although neither Blondeau nor his wife paid anything to her for her conveying all right, title and interest in the Beach Cottage to them.

(f)     In the spring of 2006, nearly two years after Blondeau had obtained the Beach Cottage using Capps' trust account, and only after Capps' son and attorney began investigating Blondeau's role as attorney-in-fact and had demanded documents from Blondeau, Blondeau's criminal defense attorney produced a purported promissory note ("the Note") from Blondeau to Capps with

regard to the Beach Cottage. This purported Note was misspelled "P0missory Note" [sic]. The Plaintiffs' white collar crime and financial fraud investigation expert, P.M. Boulus, opined, and the court finds as facts, that the Note was fraudulent, based upon the following facts:

(i)  The Note was produced years after the fact and never made part of Capps' financial documents at the time of the purchase;

(ii)  The Note was produced only after investigation into Blondeau's transactions had begun by Capps' son and her attorney;

(iii)  The Note was no more than one paragraph in length and contained none of the normal appearance of promissory notes customarily used in real estate transactions of this nature;

(iv)  The Note was dated June 9, 2004; however, it was not notarized and there is no other objective means to determine the actual date of its making;

(v)  The Note called for only 1.5% interest per annum, which is an extraordinarily low and suspicious interest rate;

(vi)  The Note was not signed by Blondeau's wife, who was made a joint tenant with rights of survivorship in this transaction;

(vii)  Despite the fact that Blondeau purportedly borrowed $350,000.00 from Capps for the purchase of the Beach Cottage property for his and his wife's separate use and enjoyment, neither Blondeau nor his wife executed or recorded a deed of trust or other security agreement regarding the purported debt of $350,000.00 used to purchase the Beach

Cottage. Therefore, in the event of a default in the payment terms of the Note, Capps would be unable to foreclose on the Beach Cottage. Furthermore, since neither Blondeau nor his wife executed a deed of trust as evidence of or security for the purported loan for the purchase, the fact that funds from Capps or the AKT financed the purchase was not recorded as a public record and thus was hidden from public view and and

(viii) Blondeau did not make any alleged payments on the Note until August 24, 2006, after almost a year in default on the purported debt, and only after Capps' legal counsel demanded payment. Blondeau made a payment in the amount of $361,673.12 on August 25, 2006.

51. On June 10, 2009, Blondeau pled guilty in federal court to investment advisor fraud as to Capps and also to making and subscribing false tax returns. By virtue of this guilty plea, Blondeau admitted, and the court finds as facts, that:

(a) Blondeau acted in the role of a registered investment advisor to Capps at all times material to Plaintiffs' claims in this civil action;

(b) Blondeau was the superior party in a fiduciary relationship and held a position of trust and confidence with respect to Capps;

(c) From 2000 through 2005, Blondeau employed a scheme to defraud Capps;

(d) The essence of Blondeau's scheme was his abuse of the fiduciary relationship and position of trust that he had established with Capps;

(e) Blondeau concealed from Capps the true nature of many transactions he initiated from both her trust account and her personal brokerage

account, whereby he was able to secure, without her knowing permission, the release of funds from those accounts which he then converted to his own personal use; and

(f) Blondeau secured Capps' signature on letters of authorization through the use of false pretenses and other fraudulent means.

52. The specific methods, means, and amounts of ongoing fraud imposed by Blondeau upon Capps were accurately pled in Plaintiffs' Complaint and proven at trial in this matter, and further supporting evidence for these matters is contained in the notebook of materials submitted by Plaintiffs' fraud expert, P.M. Boulus, which was received into evidence.

53. On or about March 5, 2007, Knight provided a written statement to his law firm of 35 years regarding his role with respect to Capps, the Baker Foundation, and the financial benefits received by him and by his children. His letter, written to the Board of Directors of his law firm, claimed that "The establishment of a foundation was recommended to Mrs. Capps by her North Carolina attorney who was preparing estate planning documents for her." The letter also stated, "I never was asked for nor did I provide any advice regarding the merits of forming the Foundation and making the contribution" and that he "never rendered any tax advice as Martha's North Carolina attorneys provided that information." Attorney Thornton testified to the contrary, particularly testifying that he never recommended as Capps' attorney that she establish a private charitable foundation, and the court finds attorney Thornton's testimony to be credible and factual. Knight's letter also admitted knowledge of Capps' vulnerability and

her reliance on Knight and Blondeau. Following Knight's explanation, his employment was terminated by his law firm.

54.     Knight admitted in his deposition that he never gave any tax or legal advice to Capps concerning the Baker Foundation. He further admitted that even though Capps knew him to be a Florida estate and tax planning attorney who had assisted her in legal matters several times previously, he never told her or informed her in writing that he was not representing her and not providing her legal or tax advice for the purpose of establishing the Foundation. Either Capps was unaware of Knight's involvement with the establishment and operation of the Baker Foundation, or she relied to her detriment on Knight to act in her best interest at all times as her fiduciary and attorney.

55.     Capps never received any legal or tax advice regarding the creation or subsequent funding of the Baker Foundation. She did not receive any material or significant tax benefit from a series of transactions that irrevocably removed to the Baker Foundation over 81% of her property from her and her estate and left it to the exclusive control of her fiduciaries, Knight and Blondeau.  Capps gave no informed consent to such transactions.

56.     Pursuant to the cross-claim of and the Default Judgment granted to the Receiver for the Baker Foundation against Blondeau, the court finds as facts that the Director Defendants (Blondeau and the Knight Defendants) misappropriated assets of the Baker Foundation and used them to enrich themselves and enjoy personal benefits therefrom.  The improper benefits included art tours and air travel, hotels and meals, attendance at galas and sponsoring of banquets, making donations in memory of their

family members, attending events securing personal recognition and/or benefits and paying a wedding chapel fee for Blondeau's daughter. This cross-claim contained specific evidence and check copies documenting such benefits. Upon the default of Blondeau to the cross-claim, the court entered a default judgment against him in the amount of $63,907.80 for these misappropriations from the Baker Foundation.

57.     The Baker Foundation was established by Blondeau and Knight properly under the relevant tax code provisions and, in fact, made charitable contributions as a 501(c)(3) entity. The establishment and operation of a proper 501(c)(3) entity was a part of Blondeau's intentional scheme and plan to obtain and use Capps' assets for his own benefit. The eleven (11) disbursements into the Baker Foundation totaling $2,281,996 were orchestrated by Blondeau as part of his scheme and plan, and irrevocably damaged Capps and her estate. Further, the operation of the Foundation and the charitable contributions it made all served to confer a benefit on Blondeau and not Capps or her estate.

58.     Ken Martin and Jack Stancil, the longtime CPAs for Capps, and for Blondeau personally, were qualified to handle tax matters related to creation and operation of the Baker Foundation. However, Blondeau orchestrated the engagement of an outside CPA, William Stark from Henderson, North Carolina, to file the annual 990-PF tax returns of the Baker Foundation. The overwhelming majority of organizations to which the Baker Foundation made charitable contributions had no connection to Capps or her estate, and instead had a personal and/or professional connection to Blondeau and or Knight, and did, in fact, benefit Blondeau and/or Knight.

59. The following facts were proven at trial, and establish, among other things, that Blondeau knowingly concealed or falsely represented material facts from Capps; and that they were reasonably calculated to, made with the intent to, and in fact did, deceive Capps to her financial detriment and to Blondeau's personal benefit:

(a) The circuitous path which funds originating in either Capps' accounts or the AKT found their way to the benefit of Blondeau;

(b) The circumventing and direct violations to the rules of conduct governing his employment and/or licensing as a broker;

(c) The many concealments from Capps' attorney, Gerald Thornton;

(d) The financial transactions benefiting Blondeau but concealing him as the true recipient;

(e) Material misstatements of fact provided to his employer, false explanations, and fabricated evidence;

(f) The admitted concealment of income received by Blondeau from Capps and/or the AKT, failure to report that income and the evasion of taxes owed on that income;

(g) The admitted, unauthorized use of Capps' Morgan Keegan debit card for wine purchases by and for the benefit of Blondeau;

(h) Blondeau's admitted fraudulent scheme orchestrated by false pretenses or other fraudulent means committed through the abuse of his fiduciary relationship;

(i) All of these transactions benefited Blondeau and none benefited Capps or her estate/beneficiaries; and

(j)     All of the factors listed as "Fraud Indicators" by Plaintiffs' fraud expert, P.M. Boulus, under Section 8 of his notebook which was received into evidence.

60.     Blondeau and Knight were Capps' fiduciaries at all times relevant to Plaintiffs' claims since the early 1990's through 2005. She had a close and personal relationship with them and she relied upon them.

61.     Subsequent to Blondeau's guilty plea and criminal judgment, Blondeaeu made certain payments of restitution to the Estate of Martha Capps and to the AKT. Blondeau is entitled to credit for such payments against any judgment entered against him in this matter. He also is entitled to credit against such judgment for any settlement amounts paid to Plaintiffs by other Defendants.

62.     Based on the evidence of record, the court further finds as a fact that Blondeau and Knight had an agreement to use their positions of trust and confidence to wrongfully obtain Capps' assets for their use and benefit.

63.     Blondeau wrongfully obtained Capps' assets in the furtherance of this agreement for his own personal benefit. Further, each time that Knight, Anne Knight, or Helen Knight received financial benefit from Capps, either directly or indirectly, Blondeau personally orchestrated and facilitated each of those transactions in furtherance of the aforementioned agreement, and, as a result, Capps and her estate suffered financial injuries.

64.     Blondeau willfully engaged in unlawful acts proscribed by Chapter 75 of the North Carolina General Statutes relating to Unfair or Deceptive Trade Practices, and he made no offer to fully resolve these matters. His refusal to resolve these matters fully

was unwarranted, and Plaintiffs suffered substantial, actual injuries from these willful and unlawful acts.

65. Subsequent to Blondeau's guilty plea and incarceration, he unsuccessfully attempted to collaterally attack his guilty plea through a claim of ineffective assistance to counsel. He claimed that the federal prosecutor misled the court about the factual basis of the charges, that his criminal defense counsel committed "wanton misconduct," and that with respect to the federal prosecutor "it was certainly wanton and has the appearance of willful misconduct." He stated that the criminal information he knowingly accepted in lieu of indictment was caused "by a runaway plaintiff and his runaway attorney." Blondeau claimed that he was serving an "undeserved sentence."

66. Following Blondeau's appeal to the 4th Circuit Court of Appeals, the federal district court held an evidentiary hearing at which Blondeau and his former criminal defense attorneys, Joe Cheshire, Esq. and Bradley Bannon, Esq., testified. The court dismissed Blondeau's appeal and found that his counsel specifically informed him that in their opinion he did not have a good case for appeal, consulted with him regarding his appellate preferences and that Blondeau admitted that he never asked them to file an appeal on his behalf.

67. Blondeau has demonstrated no apology or remorse or his actions in this matter, and he maintains to this day that he should not have been punished for any of them.

68. Blondeau's conduct against Capps was not the first time that he engaged in certain types of this conduct against a brokerage customer. From 1997 through 1999, Belle Tilley ("Tilley") was an elderly female customer and client of Blondeau's at the

Raleigh branch of the Morgan Keegan brokerage. In direct violation of the outside business activity and outside business compensation policies promulgated by his employer and/or the financial industry regulations, and in similar manner to his conduct toward Capps, Blondeau wrongfully obtained Tilley's power of attorney; served as the executor of her estate, impermissibly received $10,000 cash from Tilley's estate and received executor commissions from her estate.

69.     Pursuant to N.C. GEN. STAT. § 1D-35, the court, as trier of fact, finds, based on clear and convincing evidence, as follows:

(a)     Blondeau's motives and conduct toward Plaintiffs were morally reprehensible, including but not limited to Blondeau's repeated and knowingly false misrepresentations and concealments to Capps and her professional advisors such as her CPA and Thornton, her attorney, for the purpose of taking or controlling millions of dollars of her assets;

(b)     That at all relevant times, Blondeau's motives and conduct carried with them the likelihood of serious financial harm to Plaintiffs, and they did in fact cause actual financial damages in excess of $3,500,000 to Plaintiffs;

(c)     At all relevant times, Blondeau was fully aware of the probable consequences of his conduct, and, in fact, intended for his conduct to result in millions of dollars of financial harm to Plaintiffs;

(d)     Blondeau's conduct was undertaken over the course of some six years, during which and after which he repeatedly attempted to conceal the facts and consequences of his conduct from Capps, her estate, her children, her

attorneys, his employer, the affiliated trust company, the federal court and this court;

(e)    On an at least one occasion in the past, Blondeau committed similar wrongful conduct against Tilley, another of his brokerage company and affiliated trust company customers;

(f)    These financial transactions operated for Blondeau's personal, professional, and financial profit and benefit, were knowingly concealed and establish his knowing and guilty state of mind that these transactions were improper and wrongful; and

(g)    The punishment and deterrent purposes of N.C. GEN. STAT. § 1D-1 would both be served here by an award of punitive damages against Blondeau.

70.    Plaintiffs suffered financial injuries and damages as a proximate result of Blondeau's fraudulent and unlawful conduct in the total amount of $3,726,046.80, as follows: (a) $487,277.58 wrongfully received by Blondeau through transactions deposited to Wachovia Bank; (b) $320,722.42 wrongfully used by Blondeau for the purchase of the Beach Cottage; (c) $21,761.36 in wine purchases wrongfully made by Blondeau and charged to Capps' debit card; (d) $452,452 in capital losses wrongfully caused by Blondeau; (e) $161,837.50 wrongfully distributed to Knight and his children and (f) $2,281,996 irrevocably and wrongfully transferred to the Baker Foundation. The foregoing financial injuries and damages suffered by Plaintiffs must be reduced by the August 25, 2006 payment in the amount of $361,673.12 made by Blondeau to Capps with regard to the Beach Cottage transaction.  Accordingly, Plaintiffs suffered net

financial injuries and damages ("Compensatory Damages") as a proximate result of Blondeau's fraudulent and unlawful conduct in the total amount of $3,364,373.74.

71.     Prejudgment interest on Plaintiffs' Compensatory Damages at the legal rate from the date of filing of this civil action is calculated to be $1,569,770.74.

Based upon the foregoing Findings of Fact, the court reaches the following CONCLUSIONS OF LAW:

1.     This court has jurisdiction to hear and decide this matter.

2.     This court has jurisdiction over all the parties to this matter.

3.     Defendant Blondeau received proper, prior notice and had an opportunity to present a defense at the non-jury trial of this matter. He voluntarily chose not to participate or put on any evidence or argument in his own defense. Blondeau thereby waived his right to trial by jury.

4.     In North Carolina, a claim for constructive fraud is supported where (a) a fiduciary relationship exists that led to and surrounded a transaction, (b) in which transaction the defendant benefited by taking advantage of his position of trust and confidence, (c) the defendant intended to benefit himself in the transaction and (d) the transaction resulted in injury or damage to the plaintiff.

5.     Where a relationship of trust and confidence exists between the parties, the fiduciary owes an affirmative duty to disclose all material facts, and the failure to do so constitutes fraud.

6.     Where a confidential relationship exists, it is the duty of the one in whom confidence is reposed to exercise the utmost good faith and to refrain from abusing

such confidence by obtaining any advantage to himself at the expense of the confiding party.

7.     The general duties present in an arms-length transaction to read and understand what one is signing, and to exercise reasonable diligence, are excused where a fiduciary relationship of trust and confidence exists.

8.     Based on the facts establishing Capps' lack of financial sophistication and her vulnerable life position as an abused spouse, her age, her total reliance on Blondeau and Knight for two decades, and the special trust and confidence she reposed in them to handle all of her financial affairs, the court concludes that at all times relevant to Plaintiffs' claims Blondeau and Knight were her fiduciaries and owed to her all attendant fiduciary duties.

9.     As Capps' fiduciary, Blondeau intended to benefit himself in all of the complained of transactions and did, in fact, take advantage of his special position of trust and confidence to benefit himself in all complained of transactions. These transactions resulted in financial harms to Plaintiffs.

10.     Where the plaintiff shows that a fiduciary defendant has obtained a possible benefit from a subject transaction, the plaintiff is entitled to a rebuttable presumption that the transaction was fraudulent. This presumption can only be rebutted if the defendant proves that the subject transaction was open, fair, and honest. As described hereinabove, the court concludes the Plaintiffs sufficiently established that Blondeau, as a fiduciary, wrongfully obtained benefits as a result of all the subject transactions. Blondeau voluntarily chose not to appear or put on any evidence or

argument at the trial of this matter. Accordingly, Blondeau failed to rebut the presumption that all of the subject transactions were fraudulent to Plaintiffs.

11.     Based upon the foregoing, the claim of constructive fraud has been established against Blondeau, and Plaintiffs are entitled to compensatory damages as a result, the precise amount of which is detailed below.

12.     In North Carolina, fraud is established where (a) the defendant makes a false representation of, or conceals from plaintiff, a material fact; (b) which was reasonably calculated to deceive; (c) was made with the intent to deceive; (d) which is reasonably relied upon by, and does, in fact, deceive, the plaintiff; and (e) to the injury of the plaintiff.

13.     Based upon the foregoing findings of fact regarding Blondeau's ongoing scheme and plan to obtain Capps' signature by false pretenses, to repeatedly make false representations to Capps about the true nature of the complained of transactions, Blondeau's repeated concealments from Capps, her attorneys and advisors, his employer and the affiliated trust company, of his true involvement with regard to the complained of transactions, the court concludes that Blondeau acted with the intent and reasonable calculation to deceive Capps through false representations and concealments of material facts.

14.     The court further concludes that Capps reasonably relied upon the representations of Blondeau as her financial advisor and, at all times, operated within her legal right to assume that Blondeau as her fiduciary in fact was acting at all times and in every way in her best interests. There is no evidence before this court that Capps would have been alerted at any relevant time that Blondeau was not acting in her best

interests, as she had the right to assume. As a result, the court further concludes that Capps was, in fact, deceived by Blondeau's false representations and concealments, as a result of which Plaintiffs have suffered financial harms.

15.     Based upon the foregoing, the court concludes that the claim of fraud has been established against Blondeau, and Plaintiffs are entitled to compensatory damages as a result, the precise amount of which is detailed below.

16.     In North Carolina, pursuant to Chapter 75 of the North Carolina General Statutes, the defendant will be liable for unfair or deceptive trade practices where (a) the defendant did, in fact, commit acts of an unfair or deceptive nature; (b) in or affecting commerce; (c) that proximately cause damage to the plaintiff. An act is considered deceptive when that act has the capacity or tendency to deceive. An act will be considered unfair where it either offends established public policy, where the practice is immoral, unethical, oppressive, unscrupulous, or substantially injuries to consumers, or amounts to an inequitable assertion of the defendant's power or position. As a matter of law, fraud is considered an unfair or deceptive act for purposes for Chapter 75. Constructive fraud may be sufficient alone to establish unfair or deceptive trade practices, and the court concludes that under these circumstances, it is sufficient.

17.     Based upon the foregoing facts, Blondeau repeatedly made intentional, false representations to Capps, obtained her signature by false pretenses or other fraudulent means, as well as the other acts of fraud and constructive fraud as described hereinabove, the court concludes that Blondeau's complained of acts were both unfair and deceptive as defined by Chapter 75, and were all done in or affecting commerce in

his business as a broker and as admitted in his guilty plea. These acts proximately caused financial harms to Plaintiffs.

18. Based upon the foregoing, the court concludes that the Chapter 75 claim for unfair or deceptive trade practices has been established against Blondeau, and Plaintiffs are entitled to compensatory damages as a result, the precise amount of which is detailed below.

19. In North Carolina, pursuant to N.C. Gen. Stat. 75D-3(c), a defendant is civilly liable for a violation of the RICO statute where he commits, attempts to commit, solicits, coerces, or intimidates another person to commit, any act which would be chargeable by indictment if such act were accompanied by the necessary *mens rea* or criminal intent under certain specified state criminal statutes. Based upon the foregoing findings of fact and conclusions of law, the court concludes that Blondeau's intentional conduct would qualify as acts chargeable by indictment for the following felonious unlawful acts: N.C. Gen. Stat. § 14-90 [embezzlement by fiduciary]; § 14-101 [obtaining signatures by false pretenses]; § 14-112.2 [exploitation of an elder adult or disabled adult]; § 14-113.1 [unauthorized use of another's credit device]; § 14-113.9 [financial transaction card theft]; and/or § 14-113.13 [financial transaction card fraud]. All of the foregoing unlawful and felonious acts are contained in Chapter 14, Articles 19 and 19B of the North Carolina General Statutes, and the court therefore concludes that any one of these unlawful acts satisfies the definition of "racketeering activity" contained in N.C. Gen. Stat. § 75D-3(c)(1).

20. The court concludes that Capps was an innocent person with respect to Blondeau's wrongful conduct which caused her harm over a period of some six years,

and that Blondeau's wrongful conduct was something other than mail fraud, wire fraud, or fraud in the sale of securities that resulted in pecuniary gain to Blondeau.

21. Based upon the foregoing, the court concludes that the claim of a violation of the NC RICO statute has been established against Blondeau, and Plaintiffs are entitled to compensatory damages and reasonable attorney's fees as a result, the precise amount of which is detailed below.

22. In North Carolina, while there is no recognized cause of action for civil conspiracy, our law allows a fraud victim to recover from anyone who facilitated the fraud by agreeing for it to be accomplished. A claim based upon facilitation of fraud extends liability to those persons where (a) they operate under an agreement to do an unlawful act, or to do a lawful act in an unlawful way; (b) wrongful acts were in fact done in furtherance of that agreement; and (c) that resulted in injury to plaintiff.

23. Blondeau's conduct was wrongful and/or unlawful, and the evidence establishes that Blondeau and Knight operated pursuant to an agreement to carry out such conduct with respect to the Baker Foundation and the financial benefits received by Knight and his children to the Plaintiffs' damage, and these transactions were part of a common, fraudulent scheme. The court concludes Blondeau is thus liable for all financial benefits received by Knight and his children, as well as for all funds irrevocably transferred into the Baker Foundation.

24. As reflected in paragraph 70 of the above Findings of Fact, Plaintiffs are entitled to Compensatory Damages as a proximate result of Blondeau's wrongful actions in the amount of $3,364,373.74. Plaintiffs further are entitled to recover damages in the form of prejudgment interest in the amount of $1,569,770.74.

25.     In North Carolina, punitive damages may be awarded where the defendant is liable for compensatory damages, and where fraud, malice, or willful or wanton conduct was present and was related to the injuries for which compensatory damages were awarded. Based on the foregoing Findings of Fact, Blondeau's acts of fraud and intentional, wrongful and improper conduct satisfies this standard. Moreover, the Plaintiffs are entitled to a substantial award of punitive damages based upon the many statutory factors that are clearly present pursuant to N.C. Gen. Stat. § 1D-35 (see e.g. Paragraph 72 of the Findings of Fact herein).

26.     After considering the facts established at trial of this matter, as reflected in the above Findings of Facts, the court concludes that a punitive damages award of three times the Compensatory Damages is fair and reasonable, and meet all necessary due process tests. Accordingly, Plaintiffs are entitled to punitive damages in the amount of $10,093,121.22.

27.     The Plaintiffs are entitled to an award of reasonable attorneys' fees. In this regard, the court has received and reviewed *in camera* affidavits from counsel for the Plaintiffs Robert E. Zaytoun, Esq., of the Zaytoun Law Firm, PLLC and Gilbert W. File, Esq., of the Brownlee Law Firm.  The court also has received and reviewed a Plaintiffs' litigation expense affidavit from Rebecca J. Overstreet, Firm Administrator of the Zaytoun Law Firm, PLLC. Based upon these affidavits, the court FINDS and CONCLUDES that: (a) the respective counsel for Plaintiffs are highly experienced in previously and successfully serving as legal counsel in civil actions presenting similar complicated factual and legal issues as the instant matter, are qualified in all respects to represent Plaintiffs in this civil action, Counsel devoted themselves for some seven

years and countless working hours to the successful prosecution of this civil action in behalf of the Plaintiffs and achieved excellent results for Plaintiffs and (b) Plaintiffs incurred reasonable and necessary attorneys' fees and expenses in the amount of $2,931,664.95 during the course of this complex litigation. Plaintiffs are entitled to recover such attorneys' fees and expenses from Blondeau.

28. The court concludes that, after applying all appropriate credits to Blondeau, the Plaintiffs are entitled to judgment against Blondeau in the amount of $10,330,684.70, plus reasonable attorney's fees in the amount of $2,931,664.95 and the costs of this action.

NOW THEREFORE, based upon the foregoing FINDINGS OF FACT and CONCLUSIONS OF LAW, it is ORDERED, ADJUDGED AND DECREED that:

1. Plaintiffs shall have and recover from Defendant Harold Earl Blondeau damages in the total amount of $10,330,683.94, plus attorneys' fees and expenses in the amount of $2,931,664.95.

2. The costs of this action shall be taxed to Defendant Harold Earl Blondeau.

This the 5th day of March, 2015.